1 | MICHAEL T. RISHER (SB# 191627)
mrisher@aclunc.org
2 | LINDA LYE (SB# 215584)
llye@aclunc.org
3 | AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA, INC.
4 | 39 Drumm Street
San Francisco, CA 94111
5 | Telephone: (415) 621-2493
Facsimile: (415) 255-8437
6 |
HANNI FAKHOURY (SB# 252629)
7 | hanni@eff.org
LEE TIEN (SB# 148216)
8 | tien@eff.org
ELECTRONIC FRONTIER FOUNDATION
9 | 454 Shotwell Street
San Francisco, CA 94110
10 | Telephone: (415) 436-9333
Facsimile: (415) 436-9993
11 |
12 | Attorneys for Plaintiffs
13 | JOHN DOE, et al.
on behalf of themselves and others similarly
14 | situated

RECEIVED

2012 NOV -7  A 9: 52

RICHARD W. WIEKING
CLERK. U S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

15

## UNITED STATES DISTRICT COURT

16

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

17                           C 12 5713

18

| JOHN DOE, *et al.*, on behalf of themselves and others similarly situated, | Civil Case No. _____ |
|---|---|
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| v. | |
| KAMALA D. HARRIS, *et al.*, | |
| Defendants. | |

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION..................................................................................................1

II.   BACKGROUND...................................................................................................2

   A.   The California Sex Offender Registry ........................................................2

   B.   Recidivism Rates Vary Among Sex Offenders in Predictable Ways ........................3

   C.   Sex Crimes are Overwhelmingly Committed by Family Members and
        Acquaintances, Not Strangers who Use the Internet to Meet Their Victims..............4

   D.   The Internet Is a Forum for Expression and Association............................................5

   E.   Newly Enacted Requirements of CASE Act................................................................6

   F.   Plaintiffs Engage in Protected Online Speech ...........................................................7

III.  LEGAL STANDARD...........................................................................................9

IV.   ARGUMENT .....................................................................................................10

   A.   Plaintiffs are Likely to Succeed on the Merits..........................................................10

        1.   The CASE Act is unconstitutionally overbroad because it makes it a crime to
             engage in constitutionally protected anonymous speech and is not narrowly
             tailored................................................................................................................10

             a.   The CASE Act criminalizes constitutionally protected anonymous
                  online speech ..........................................................................................11

             b.   The CASE Act is not narrowly tailored .................................................12

        2.   The CASE Act is unconstitutional because its burdensome registration
             requirements are not narrowly tailored .............................................................17

             a.   The CASE Act's registration requirements trigger First Amendment
                  scrutiny...................................................................................................17

             b.   The CASE Act must satisfy strict scrutiny because it discriminates
                  among speakers ......................................................................................18

             c.   The CASE Act is not sufficiently tailored to satisfy either
                  intermediate or strict scrutiny...............................................................19

        3.   The CASE Act is unconstitutionally vague .......................................................20

        4.   The CASE Act violates Plaintiffs' freedom of association by requiring the
             compelled disclosure of the membership of their online communities........23

i

| | | | |
|---|---|---|---|
| | B. | Plaintiffs Face Imminent and Irreparable Harm | 24 |
| | C. | An Injunction Against Enforcement Serves the Public Interest and the Balance of Equities Tips in Plaintiffs' Favor | 24 |
| | D. | Scope of Relief | 25 |
| V. | | CONCLUSION | 25 |

# TABLE OF AUTHORITIES

## Federal Cases

*ACLU v. Johnson,*
    194 F.3d 1149 (10th Cir. 1999).................................................................25

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011)...............................................................10

*American Civil Liberties Union v. Reno,*
    31 F.Supp.2d 473 (E.D. Pa. 1997), *aff'd* 542 U.S. 656 (2004) .............17

*American Legion Post 7 of Durham, N.C. v. City of Durham,*
    239 F.3d 601 (4th Cir. 2001)..................................................................17

*Art of Living Found. v. Does 1-10,*
    2011 WL 5444622 (N.D. Cal. Nov. 9, 2011)......................................12, 24

*Ashcroft v. Free Speech Coal.,*
    535 U.S. 234 (2002)...........................................................................10, 19

*Baggett v. Bullitt,*
    377 U.S. 360 (1964)..............................................................................23

*Bates v. State Bar of Arizona,*
    433 U.S. 350 (1977)..............................................................................17

*Berger v. City of Seattle,*
    569 F.3d 1029 (9th Cir. 2009).................................................................14

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973)..............................................................................17

*Brown v. Socialist Workers,*
    459 U.S. 87 (1982)................................................................................23

*Buckley v. Am. Constitutional Law Found.,*
    525 U.S. 182 (1999)..............................................................................10

*Citizens United v. Federal Election Com'n,*
    130 S.Ct. 876 (2010) ...........................................................................18

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
    657 F.3d 936 (9th Cir. 2011)..................................................11, 14, 16, 19

*Denney v. Drug Enforcement Admin.,*
    508 F.Supp.2d 815 (E.D. Cal. 2007)........................................................19

*Doe v. Nebraska,*
        --- F.Supp.2d ----, 2012 WL 4923131 (D. Neb. Oct. 17, 2012)........................................*passim*

*Doe v. Shurtleff,* 2008 WL 4427594 (D. Utah Sept. 25, 2008) ("*Shurtleff I*"),
        *vacated after law amended by,* 2009 WL 2601458 (D. Utah Aug 20, 2009)
        ("*Shurtleff II*"), *aff'd,* 628 F.3d 1217 (10th Cir. 2010) ......................................10, 16

*Farris v. Seabrook,*
        677 F.3d 858 (9th Cir. 2012)...........................................................................10, 24

*Golan v. Gonzales,*
        501 F.3d 1179 (10th Cir. 2007).............................................................................19

*Grayned v. City of Rockford,*
        408 U.S. 104 (1972) ...............................................................................10, 12, 20

*Hunt v. City of Los Angeles,*
        638 F.3d 703 (9th Cir. 2011)...........................................................................20, 23

*Hynes v. Mayor and Council,*
        425 U.S. 610 (1976)...............................................................................................20

*In re Anonymous Online Speakers,*
        661 F.3d 1168 (9th Cir. 2011)........................................................................11, 15

*Klein v. City of San Clemente,*
        584 F.3d 1196 (9th Cir. 2009)........................................................................10, 24

*Laird v. Tatum,*
        408 U.S. 1 (1972) ...................................................................................................17

*Lorillard Tobacco Co. v. Reilly,*
        533 U.S. 525 (2001) ..............................................................................................16

*Mass. Bd. of Retirement v. Murgia,*
        427 U.S. 307 (1976)...............................................................................................19

*McIntyre v. Ohio Elections Comm.,*
        514 U.S. 334 (1995)...............................................................................................11

*Melendres v. Arpaio,*
        695 F.3d 990 (9th Cir. 2012)................................................................................24

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,*
        460 U.S. 575 (1983) ..............................................................................................18

*NAACP v. Alabama,*
        357 U.S. 449 (1958) .........................................................................................23, 24

*Nunez v. Holder*,
      594 F.3d 1124 (9th Cir. 2010)..........................................................................................3

*Ohio Citizen Action v. City of Mentor-On-The-Lake*,
      272 F. Supp. 2d 671 (N.D. Ohio 2003)........................................................................15

*Perry v. Schwarzenegger*,
      591 F.3d 1147 (9th Cir. 2010).....................................................................................24

*Reno v. ACLU*,
      521 U.S. 844 (1997)...............................................................................................16, 19

*Sable Communications v. FCC*,
      492 U.S. 115 (1989)....................................................................................................18

*Sammortano v. First Jud. Dist. Court*,
      303 F.3d 959 (9th Cir. 2002).......................................................................................24

*Scott v. Roberts*,
      612 F.3d 1279 (11th Cir. 2010)...................................................................................24

*Shelton v. Tucker*,
      364 U.S. 479 (1960).....................................................................................................24

*Simon and Schuster, Inc. v New York State Crime Victims Bd.*,
      502 U.S. 105 (1991)...............................................................................................17, 19

*Smith v. Goguen*,
      415 U.S. 566 (1974).....................................................................................................20

*Sorrell v. IMS Health Inc.*,
      131 S.Ct. 2653 (2011)..................................................................................................18

*Talley v. California*,
      362 U.S. 60 (1960).......................................................................................................11

*United States v. T.M.*,
      330 F.3d 1235 (9th Cir. 2003)......................................................................................13

*United States v. Weber*,
      451 F.3d 552 (9th Cir. 2006).......................................................................................14

*United States v. Wolf Child*,
      --F.3d--, 2012 WL 5200347 (9th Cir. 2012) ..............................................................14

*Walker v. County of Santa Clara*,
      2011 WL 4344212 (N.D. Cal. 2011).............................................................................9

*Watchtower Bible and Tract Soc'y of N.Y., Inc. v. Village of Stratton*,
      536 U.S. 150 (2002).....................................................................................................11

v

*White v. Baker,*
    696 F. Supp. 2d 1289 (N.D. Ga. 2010) ........................................................................*passim*

*Winter v. Natural Res. Def. Council,*
    555 U.S. 7 (2008) ..........................................................................................................9

### State Cases

*Dendrite Int'l, Inc. v. Doe No. 3,*
    775 A.2d 756 (N.J. Super. Ct. App. Div. 2001)..........................................................12

*Doe No. 1 v. Cahill,*
    884 A.2d 451 (Del. 2005) ............................................................................................12

*Indep. Newspapers, Inc. v. Brodie,*
    966 A.2d 432 (Md. 2009)..............................................................................................12

*Krinsky v. Doe 6,*
    72 Cal. Rptr. 3d 231 (Cal. Ct. App. 2008) ..................................................................12

*Mobilisa, Inc. v. Doe 1,*
    170 P.3d 712 (Ariz. Ct. App. 2007) .............................................................................12

*Mortgage Specialists, Inc. v. Implode-Explode Heavy Industries, Inc.,*
    999 A.2d 184 (N.H. 2010) ...........................................................................................12

*People v. Archer,*
    98 Cal. App. 4th 402 (Cal. Ct. App. 2002) ...................................................................3

*People v. Kennedy,*
    194 Cal. App. 4th 1484 (2011).......................................................................................2

*People v. McKee,*
    47 Cal. 4th 1172 (Cal. 2010).......................................................................................10

*People v. Meeks,*
    123 Cal. App. 4th 695 (Cal. Ct. App. 2004) .................................................................7

*People v. Newton,*
    9 Cal. App. 3d Supp. 24 (Cal. App. Dep't Super. Ct. 1970)........................................3

*People v. Rylaarsdam,*
    130 Cal. App. 3d Supp. 1 (Cal. App. Dep't Super Ct.1982)........................................3

MPA ISO TEMPORARY RESTRAINING ORDER &
PRELIMINARY INJUNCTION

## State Statutes

Californians Against Sexual Exploitation Act ("CASE Act" or "Act") ....................................*passim*

Ca. Gov't Code § 12511 .............................................................................................25

Ca. Gov't Code § 12512 .............................................................................................25

Ca. Gov't Code § 12524 .............................................................................................25

Ca. Gov't Code § 12550 .............................................................................................25

Ca. Gov't Code § 12560 .............................................................................................25

Cal. Pen. Code § 290 .........................................................................................*passim*

Cal. Pen. Code § 314 ...................................................................................................3

Cal. Pen. Code § 1203 .................................................................................................3

Cal. Pen. Code § 3008 .................................................................................................3

## Federal Rules

Fed. Rule Civ. Pro. 65 ...............................................................................................25

## Federal Constitutional Provisions

U.S. Const. amend. I ...........................................................................................*passim*

U.S. Const. amend. XIV ...........................................................................................10

## State Constitutional Provisions

Ca. Const. art. V .......................................................................................................25

Cal. Const. art. II .......................................................................................................7

## Legislative Materials

2005 Cal. Legis. Serv. Ch. 722 (A.B. 1323) .............................................................15

MPA ISO TEMPORARY RESTRAINING ORDER &
PRELIMINARY INJUNCTION

## I.    INTRODUCTION

Plaintiffs seek a TRO and preliminary injunction to prohibit the state from enforcing a new California statute that criminalizes online anonymous speech and imposes burdensome reporting requirements on the online speech, whether anonymous or not, of all persons convicted after 1944 of any sex-related offense that requires registration, including misdemeanors such as indecent exposure ("registrants"). The law, the Californians Against Sexual Exploitation Act ("CASE Act" or "Act"), was enacted by voter initiative yesterday and is effective today. It expressly requires all of the 73,900 current California registrants currently living in the community to *"immediately"* provide the police with information about their access to and use of the Internet for expressive purposes; they must also document and disclose any additions or changes to such information within 24 hours. A failure to comply with any of these new requirements is a crime, often a felony.

Immediate relief is necessary to prevent irreparable harm to the rights to freedom of expression and freedom of association granted by the First Amendment. Plaintiffs have a substantial likelihood of succeeding on the merits for the following four reasons.

**First,** the Act is overbroad because it criminalizes constitutionally protected anonymous speech but is not narrowly tailored because it restricts far too much anonymous speech by too many speakers, and allows the information to be used for too many purposes. The statute prohibits *all* anonymous speech, even if it pertains to news, politics, and professional activity, and could not possibly be used to commit a crime (such as commenting on a newspaper website). The statute also applies to *all* registrants, regardless of the severity, type, or age of the underlying offense and whether it had any connection whatsoever to the Internet or to children. Only 1% of sex-crimes against children involve any sort of technology, and even fewer involve the use of the Internet. Registered sex offenders make up only two to four percent of persons arrested for technology-facilitated sex crimes against youth. And after a number of years in the community without a new arrest, sex offenders are *less likely* to re-offend than a non-sexual offender is likely to commit an "out of the blue" sexual offense. Thus, the Act criminalizes many types of anonymous speech, and the speech of many people, that do not pose the dangers with which the statute is concerned. Further, the Act contains no real restrictions on the purposes for which the information may be

used by law enforcement.

**Second**, the Act is unconstitutional because it imposes burdensome registration requirements on a great deal of non-anonymous online speech by registrants, but is not narrowly tailored to its stated goals, for the reasons set forth above.

**Third**, the Act violates due process because it is impossibly vague. It requires registrants immediately to report all "Internet service providers" and "Internet identifiers," but the definitions of these terms leave it entirely unclear whether they trigger reporting obligations for connecting to a wireless network at a coffee shop or hotel, renting a car equipped with an Internet-connected navigation system, creating an account on a new service with the same user name as that used on a different service, or buying something from an online retailer that allows customer reviews, such as Amazon.com. The statute is also unclear whether a registrant must report all "Internet service providers" and "Internet identifiers" she has ever used or only those currently in active use. The vague definitions do not give registrants sufficient notice of what they need to report to comply with the law, a vagueness that is particularly intolerable given the free speech rights implicated and the severe criminal penalties for failure to comply.

Fourth, the Act is unconstitutional because it violates registrants' associational rights by potentially compelling disclosure of their participation in online forums organized by political and other groups and by compelling disclosure of the identity of other registrants with whom they discuss political issues.

## II.    BACKGROUND

### A.    The California Sex Offender Registry

California law requires every person convicted of a variety of offenses after July 1, 1944 to register as a sex offender for the rest of his or her life. *See* Cal. Pen. Code § 290(b) (all statutory references are to this Code unless otherwise noted). Registrants must provide law enforcement with their address, employer, and license plate numbers within five working days of changing their residence address, and annually. *See* §§ 290.012, 290.013, 290.015(a). Registration is automatic, retroactive, mandatory, lifelong, and not subject to plea bargaining. *See People v. Kennedy*, 194 Cal. App. 4th 1484, 1491 (2011); *see also* §§ 290.007, 290.5.

2

Registration is required for anybody convicted of any of the some three dozen offenses listed in the statute. § 290(c). In addition, registration is required upon conviction of any offense that the court determines was "committed … for purposes of sexual gratification." § 290.006. One of the offenses that specifically requires registration is misdemeanor indecent exposure, Penal Code § 314, which can include nude erotic dancing on a stage at a bar (*see People v. Newton*, 9 Cal. App. 3d Supp. 24 (Cal. App. Dep't Super. Ct. 1970)), exposing oneself during an incident of road rage (*see People v. Archer*, 98 Cal. App. 4th 402 (Cal. Ct. App. 2002)), or exposing oneself to an undercover officer who the defendant thought was interested in engaging in sexual activity (*see People v. Rylaarsdam*, 130 Cal. App. 3d Supp. 1 (Cal. App. Dep't Super Ct.1982)). *See generally Nunez v. Holder*, 594 F.3d 1124, 1133-38 (9th Cir. 2010) (discussing broad range of conduct prohibited by statute).

The law's broad scope means that California has the largest number of registered sex offenders of any state: approximately 73,900 registrants, not including persons who are in custody or have been deported. *See* Dec. of Brian Abbott ¶ 7.

**B.    Recidivism Rates Vary Among Sex Offenders in Predictable Ways**

Extensive research demonstrates that recidivism rates are not uniform across all sex offenders. Rather, the risk of re-offending varies based on well-known factors and can be reliably predicted by widely used risk assessment tools such as the Static-99, which classify offenders into varying risk levels. *See* Dec. of R. Karl Hanson ¶¶ 2, 14-19. Indeed, outside of the context of its sex offender registry, California uses these tools to distinguish between sex offenders who pose a high risk to the public and those who do not. For example, California law mandates the use of the Static-99 to determine which offenders require a high level of supervision and which do not. *See* § 290.04(b)(1); *see also* §§ 290.04-290.07, 1203e, 1203f, 3008; Hanson Dec. ¶ 18. The majority of felony sex offenders sentenced to prison and released on parole in California after 2005 are classified as posing a low or moderate-low risk of reoffending under Static-99 (scores 0-3). Abbot Dec. ¶¶ 9-10. Less than 10% are classified as high risk. *Id.*[1]

Research also contradicts the popular notion that sexual offenders remain at risk of re-

---

[1] Similarly, the state's website contains varying amounts of information about registrants offenders based on their offense; lower-level offenders are not even on the site. *See* § 290.46.

3

offending through their lifespan.  Most sex offenders do not re-offend.  Hanson Dec. ¶¶ 19-25; Abbott Dec. ¶¶ 13-15.  The longer offenders remain offense-free in the community, the less likely they are to re-offend sexually.  Hanson Dec. ¶¶ 7-13, 22, 26-38; Abbott Dec. ¶ 16.  On average, the likelihood of re-offending drops by 50% every five years that an offender remains in the community without a new arrest for a sex offense.  Hanson Dec. ¶ 27.  Eventually, persons convicted of sex offenses are *less likely* to re-offend than a non-sexual offender is to commit an "out of the blue" sexual offence. *See id.* ¶¶ 28, 31-33.  For example, offenders who are classified as "low risk" pose no more risk of recidivism than do individuals who have never been arrested for a sex-related offense but have been arrested for some other crimes.  *See id.* ¶ 30.  After 10 to 14 years in the community without committing a sex offense, medium-risk offenders pose no more risk of recidivism than individuals who have never been arrested for a sex-related offense but have been arrested for some other crimes.  *See id.* ¶¶ 30, 34.  The same is true for high-risk offenders after 17 years without a new arrest for a sex-related offense.  *See id.* ¶ 35.  Ex-offenders who remain free of any arrests following their release should present an even lower risk.  *See id.* ¶ 39. Importantly, post-release factors such as cooperation with supervision, treatment, can dramatically reduce recidivism, and monitoring these factors can be highly predictive.  *See id.* ¶¶ 23, 39-40; Abbott Dec. ¶¶ 17-18.

Based on this research, criminal justice and recidivism experts recommend that "rather than considering all sexual offenders as continuous, lifelong threats, society will be better served when legislation and policies consider the cost/benefit break point after which resources spent tracking and supervising low-risk sexual offenders are better re-directed toward the management of high-risk sexual offenders, crime prevention, and victim services." *See* Hanson Dec. ¶ 41.

### C.    Sex Crimes are Overwhelmingly Committed by Family Members and Acquaintances, Not Strangers who Use the Internet to Meet Their Victims

In only very rare cases are sex crimes against children committed by strangers whom they have met on the Internet.  Ninety percent of sex offenses against children are committed by family members and acquaintances, not strangers, as are eighty percent of sex crimes against older victims.  Abbott Dec. ¶ 11.  And arrests for *all* technology-facilitated sex crimes against minors (including those committed by acquaintances or family members) constitute only about 1% of all

arrests for sex crimes against children. *See* Dec. of David Finkelhor ¶¶ 12-13. Of that 1%, nearly half (46%) were for possession of child pornography. *See id.* ¶ 20.

Registrants constitute only a small percentage of those who commit technology-facilitated crimes against children: only 4% of persons arrested for technology-facilitated crimes against youth victims were registered sex offenders, and only 2% of those arrested for soliciting undercover investigators were registered sex offenders. *See id.* ¶ 18; Abbott Dec. ¶ 21.

Online targeting of children is decreasing, as are sex crimes against children in general. *See* Finkelhor Dec. ¶¶ 14-17. Studies show a 50% decline between 2000 and 2010 in sexual solicitation of youth on the Internet. *See id.* ¶ 14.

### D.    The Internet Is a Forum for Expression and Association

At the same time, the role of the Internet as a forum for expression, communication, and association has continued to expand. There are millions, if not hundreds of millions, of web sites incorporating some form of "social networking" functionality, *e.g.*, the ability to create a profile and post some form of content. Dec. of David G. Post ¶¶ 35-36. While the total number of different web sites continues to increase, so does the user base and usage of the most popular sites and services. For example, Facebook alone now has more than one billion users worldwide, and Twitter users generate hundreds of millions of "tweets" per day. *Id.* ¶ 9.

Use of the Internet for a wide range of activities is also increasing. Most Americans use the Internet, and the average American spends approximately an hour per day online. *Id.* ¶ 8. Roughly half of Americans regularly obtain at least some news online, including a growing number who obtain news from social networks. *Id.* ¶ 12. Approximately 40 percent of all Americans have engaged in some form of online civic or political activity beyond simply reading about political issues. *See id.* ¶ 13. And millions of Americans use the Internet to carry out their current employment, seek new employment, or further their education. *See id.* ¶¶ 14-16.

As a result, Americans visit a large number of different Internet sites, many of which require or permit the creation of user names, screen names, or similar identifiers, and engage in various expressive activities on these sites. In a typical month the average Internet user visits well over 100 distinct web sites, and prolific Internet users may visit far more. *See id.* ¶10. Using these

sites and accounts, Internet users can and do post feedback on both recently-purchased items and their sellers, collaboratively create and maintain online encyclopedia and documents, discuss local, national, and international events, and advertise for and otherwise conduct their businesses. *See id.* ¶¶ 11-12, 14, 35.

Many Internet users also use a large number of services to access the Internet. In particular, any person who travels is likely to use one or more new providers, such as a local cellular network or a wireless network at a hotel or café, at each destination. *See id.* ¶¶ 45, 47.

Plaintiffs and other registered sex offenders use the Internet as do other Americans: to conduct business, communicate with friends and associates, engage in self-expression, comment on news articles, and participate in groups with political, religious, or recreational purposes. *See* Abbott Dec. ¶ 12; Doe Dec. ¶¶ 7-14; Roe Dec. ¶¶ 7-11, 14. They have and create multiple user names and similar identifiers for these activities. Doe Dec. ¶¶ 8-11, 21.

### E.    Newly Enacted Requirements of CASE Act

The CASE Act adds to the types of information an offender is required to register. In particular, registrants are now required to provide to law enforcement "[a] list of any and all Internet identifiers established or used by the person" and "[a] list of any and all Internet service providers used by the person." *See* CASE Act, § 12 (codified as amended at § 290.015(a)(4), (5)). The law defines these terms as follows:

> "Internet service provider" means a business, organization, or other entity providing a computer and communications facility directly to consumers through which a person may obtain access to the Internet. An Internet service provider does not include a business, organization, or other entity that provides only telecommunications services, cable services, or video services, or any system operated or services offered by a library or educational institution.

> "Internet identifier" means an electronic mail address, user name, screen name, or similar identifier used for the purpose of Internet forum discussions, Internet chat room discussions, instant messaging, social networking, or similar Internet communication.

*Id.* at § 13 (codified as amended at § 290.024(a), (b)).

Every registrant must provide this newly required information "immediately" after the law becomes effective and thereafter within 24 hours after he or she "adds or changes his or her account with an Internet service provider or adds or changes an Internet identifier." *Id.* at § 11

6

1   (codified as amended at § 290.014(b)).  The law went into effect the day after the election.  *See*

2   Cal. Const. art. II, § 10(a).

3        As with other registration requirements, a violation of these requirements is a crime.  If the

4   individual was required to register because of a prior misdemeanor conviction and has no prior

5   convictions for violating registration requirements, then the failure to provide this information

6   within 24 hours is punishable as a misdemeanor; otherwise, it is a felony punishable by up to three

7   years in state prison, a sentence that may be dramatically increased if the registrant has any prior

8   felony convictions.  *See* § 290.018(a)-(c); *see also People v. Meeks*, 123 Cal. App. 4th 695, 706

9   (Cal. Ct. App. 2004) (upholding life sentence for failure to re-register after moving).

    **F.    Plaintiffs Engage in Protected Online Speech**

10       Plaintiff John Doe, a resident of Alameda, is a 75-year old registrant who was convicted

11  26 years ago, in 1986, of two crimes that did not involve a computer or the Internet.  He has had

12  no subsequent arrests or convictions.  *See* Doe Dec. ¶¶ 2-4.  In the 21 years since he was released

13  from prison, he has worked hard to repay his debt to society.  He is an activist on sex offender

14  issues, working with victims groups, treatment professionals, and sex offenders.  *See id.* ¶¶ 5-7.

15  From 2000 until earlier this year, when he was given a terminal health diagnosis, he operated two

16  websites that provided sex offenders with information about registration requirements and

17  recovery resources.  *See id.* ¶ 8.  His websites also provided an anonymous online forum for sex

18  offenders to discuss their recovery with other sex offenders.  Anonymity was key to the online

19  discussions so that offenders would feel free to express themselves openly without fear of

20  retaliation or community embarrassment.  *See id.* ¶¶ 8-9.

21       His health recently improved and Doe now wishes to resume operating his websites and

22  return to his activism on issues affecting the offender community.  *See id.* ¶ 11-12.  But the Act

23  will interfere with his ability to provide offenders with an essential forum to communicate with

24  each other about sensitive subjects such as their recovery or registration requirements, because

25  their frank discussions are made possible only by their anonymity.  *See id.* ¶ 13-14. In addition,

26  he has contributed to a wide variety of online forums over the years and compiling a

27

28

                                                7

comprehensive list of all those sites, as the Act requires, would be highly burdensome, if not impossible, which will deter his own online speech. *See id.* ¶¶ 13-15.

Plaintiff Jack Roe was convicted of two registerable offenses before 1993. Neither crime involved use of the Internet or a computer, and since he was released from prison in the late 1990s, he has had no arrests or convictions. *See* Roe Dec. ¶¶ 3-4. He has since purchased a home and built an Internet-based business for which he must routinely use websites that require usernames. *See id.* ¶¶ 7-10. He anonymously maintains blog that discusses matters of public concern; users can also comment anonymously on the blog. *See id.* ¶ 12. Anonymity is essential to that blog because it protects him from retaliation from those who would be upset about the information revealed on the blog. *See id.* ¶ 13. Plaintiff Roe also comments regularly on online news articles; he does so anonymously to express his true opinions about oftentimes controversial topics to avoid any consequences to his business. *See id.* ¶ 14. He is concerned about the burdens of complying with the CASE Act, in particular, the difficulty of accurately recalling and compiling a list of each and every username or online account he has used since he was released from prison 13 years ago. *See id.* ¶ 21.

Roe has previously experienced retaliation against him on the basis of his status as a registered sex offender. When California first made registrant information available to the public, neighbors confronted him about his status and business competitors broadcast his status, ruining his business. *See id.* ¶ 19. As a result of the social stigma associated with his status and the past retaliation he has suffered, Plaintiff Roe would stop engaging in online speech. *See id.* ¶ 20. In fact, he has left the state because of the new law but wants to return if it is held unenforceable. *See* Supp. Roe Dec. ¶¶ 4-6. Roe's experience of retaliation is not unique. Many registrants have lost their jobs or homes when information about their offender status was publicized by law enforcement. *See* Steen Dec. ¶¶ 2-4.

Plaintiff California Reform Sex Offender Laws ("California Reform") is a tax-exempt, non-profit organization dedicated to protecting the rights of individuals convicted of sex-related offenses. It is committed to the principles that no sexual abuse is ever acceptable; sex offense laws and policies should be based on sound research, not fear and panic; current laws and policies

that paint all sex offenders with one broad brush are counterproductive; and that sex-offender registration and residency laws do not protect children but instead ostracize and dehumanize individuals and their families. *See* Bellucci Dec. ¶ 4. It has 352 members who are registrants in the state of California. *See id.* ¶¶ 2-6. California Reform maintains a website on which it informs its members and the public about legal and policy issues affecting registrants for the purpose of encouraging political and social change on these issues. *See id.* ¶ 8. The site also provides a discussion forum that allows anonymous commentary on issues affecting registrants. In response to encouragement by California Reform that registrants attend a particular Anaheim City Council meeting, one registrant recently commented: "I wish I had the courage to do so. ... After the first post I made [on this website] I waited in anxiety for the police to come knocking at my door. ... I would be afraid to post here anymore and this is the only place I have been able to share [a] few of my thoughts." *See id.* ¶ 12. As shown by this comment, registrants would be chilled from commenting on Plaintiff California Reform's discussion forum website if they were required to reveal their identities; the CASE Act would thus interfere with Plaintiff California Reform's ability to provide a forum for registrants to express their views. *See id.* ¶16. The website also has several articles about Proposition 35; the comments on one of them show that registrants are worried that they do not understand what information they will have to provide if the law passes. *See id.* ¶¶ 13-15 & Ex. B.

## III.    LEGAL STANDARD

"The standard for issuing a TRO is the same as that for issuing a preliminary injunction." *Walker v. County of Santa Clara*, 2011 WL 4344212 at *2 (N.D. Cal. 2011). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). If plaintiffs show a "likelihood of irreparable injury and that the injunction is in the public interest," a "preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir.

2011); *accord Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012). The law "clearly favors granting preliminary injunctions to a plaintiff… who is likely to succeed on the merits of his First Amendment claim." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).

## IV.   ARGUMENT

### A.   Plaintiffs are Likely to Succeed on the Merits

#### 1.   The CASE Act is unconstitutionally overbroad because it makes it a crime to engage in constitutionally protected anonymous speech and is not narrowly tailored

Three federal courts have invalidated or enjoined the enforcement of laws[2] that require sex offenders to provide the government with identifying information about their online speech. *See Doe v. Nebraska*, --- F.Supp.2d ----, 2012 WL 4923131 (D. Neb. Oct. 17, 2012); *White v. Baker*, 696 F. Supp. 2d 1289 (N.D. Ga. 2010); *Doe v. Shurtleff*, 2008 WL 4427594 (D. Utah Sept. 25, 2008) ("*Shurtleff I*"), *vacated, after law amended, by* 2009 WL 2601458 (D. Utah Aug 20, 2009) ("*Shurtleff II*"), *aff'd*, 628 F.3d 1217 (10th Cir. 2010). Like those laws, the CASE Act is facially unconstitutional because it criminalizes speech that the First Amendment protects and is not narrowly tailored to the government's interests of preventing sex offenses and human trafficking.

A statute is unconstitutionally "'overbroad' in violation of the First Amendment if in its reach it prohibits constitutionally protected conduct." *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). "The crucial question, then, is whether the ordinance sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments." *Id.* at 114-15; *see also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 237 (2002) ("The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process."). Statutes that prohibit protected speech must be "narrowly tailored to further [the government's] compelling interest." *Grayned*, 408 U.S. at 119.[3] An

---

[2] That this statute was enacted by initiative does not affect the constitutional analysis. *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 194 (1999) ("The voters may no more violate the United States Constitution by enacting a ballot issue than the general assembly may by enacting legislation."); *see also People v. McKee*, 47 Cal. 4th 1172, 1206 (Cal. 2010) ("assertions, written into the findings of [ballot initiative] by those who drafted the initiative, are not the same as facts" and cannot satisfy state's burden when a constitutional right is at stake).

[3] These requirements apply to laws such as this one that seek to protect children from criminal acts. *See Free Speech Coal.*, *535 U.S.* at 252-53, 255 (2002) (where "the Government wants to keep speech from children not to protect them from its content but to protect them from those who

10

1    individual has standing to challenge a law as overbroad even if a more narrowly tailored law could

2    properly be applied to him. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,

3    657 F.3d 936, 944 (9th Cir. 2011).

        a.    **The CASE Act criminalizes constitutionally protected**
4              **anonymous online speech**

5        The CASE Act sweeps within its prohibitions speech that is constitutionally protected

6    anonymous online speech. "Under our constitution, anonymous [speech] … is not a pernicious,

7    fraudulent practice, but an honorable tradition of advocacy and of dissent." *McIntyre v. Ohio*

8    *Elections Comm.*, 514 U.S. 334, 357 (1995) (law prohibiting anonymous leafletting

9    unconstitutional); *see also Watchtower Bible and Tract Soc'y of N.Y., Inc. v. Village of Stratton*,

10   536 U.S. 150, 166 (2002); *Talley v. California*, 362 U.S. 60, 64-65 (1960). "As with other forms

11   of expression, the ability to speak anonymously on the Internet promotes the robust exchange of

12   ideas and allows individuals to express themselves freely without fear of economic or official

13   retaliation or concern about social ostracism." *In re Anonymous Online Speakers*, 661 F.3d 1168,

14   1173 (9th Cir. 2011) (internal quotes omitted).

15       The Act prohibits registrants from using a pseudonymous screen name to participate in

16   online speech without disclosing their real identity.  Registrants who engage in anonymous online

17   speech but fail, within 24 hours, to disclose to the police any new "Internet identifiers" face

18   criminal prosecution, including up to three years in state prison, possibly longer. *See* CASE Act,

19   § 11 (codified as amended at § 290.014(b)); § 290.018(a)-(c). The Act thus criminalizes

20   anonymous online speech by registrants.

21       While the Act requires after-the-fact identification, and not identification as a prerequisite

22   to the speech, the effect is functionally and legally equivalent: a prohibition on pseudonymous

23   speech online. Numerous courts, including this one, have recognized that requiring anonymous

24   speakers to identify themselves even long after the fact infringes on anonymity in the same way as

25   contemporaneous identification requirements, and have thus imposed demanding standards before

26   civil plaintiffs allegedly harmed by speech can unmask an anonymous online speaker. *See Art of*

27   would commit other crimes," it cannot employ a "restriction [that] goes well beyond that interest
     by restricting the speech available to law-abiding adults.").

28                                         11

*Living Found. v. Does 1-10*, 2011 WL 5444622, at *7 (N.D. Cal. Nov. 9, 2011).[4] The loss of anonymity deters speech regardless of when the coerced identification of the speaker occurs. *See id.* at *8-*9;[5] *see also* Bellucci Dec. ¶ 12 (registrant who made an anonymous comment on California Reform's website about a proposal to ban registrants from parks wrote that "[a]fter the first post I made [on the site] I waited in anxiety for the police to come knocking at my door. I will probably do the same after this post," and that if Prop. 35 passes and he is forced to disclose information about his Internet activity, "I would be afraid to post here anymore and this is the only place I have been able to share a few of my thoughts.").

### b.    The CASE Act is not narrowly tailored

Because the Act criminalizes protected speech, it must be "narrowly tailored to further" the government's goals. *Grayned*, 408 U.S. at 119. But in several ways, the Act goes far beyond what is necessary to further the government's interest in "track[ing] and prevent[ing] online sex offenses and human trafficking," CASE Act § 3(3).

First, the Act prohibits far more anonymous speech than is necessary. Where, as here, the state seeks to prevent sex offenses, the regulation must be targeted at "the means by which sex offenders may communicate with [their victims] and by which [their victims] may respond to offenders' sexual advances," "usually, but not exclusively, interactive, and often real time" "Internet communication." *White*, 696 F.Supp.2d at 1311. But rather than requiring disclosure of Internet identifiers only when used in this tailored context, the Act requires registrants to disclose to the police *all* Internet identifiers, including identifiers used to comment anonymously on articles published on newspaper websites like that of the New York Times, to participate in discussion groups pertaining to the civil rights of § 290 registrants, like that of Plaintiff California Reform, or to run Plaintiff Roe's anonymous blog. *See* Post Dec. ¶ 28; Bellucci Dec. ¶¶ 11, 17-18; Roe Dec.

---

[4] *See also, e.g., Mortgage Specialists, Inc. v. Implode-Explode Heavy Industries, Inc.*, 999 A.2d 184 (N.H. 2010); *Indep. Newspapers, Inc. v. Brodie*, 966 A.2d 432 (Md. 2009); *Krinsky v. Doe 6*, 72 Cal. Rptr. 3d 231 (Cal. Ct. App. 2008); *Mobilisa, Inc. v. Doe 1*, 170 P.3d 712 (Ariz. Ct. App. 2007); *Doe No. 1 v. Cahill*, 884 A.2d 451, 460-61 (Del. 2005); *Dendrite Int'l, Inc. v. Doe No. 3*, 775 A.2d 756 (N.J. Super. Ct. App. Div. 2001).

[5] In *Art of Living*, more than a year elapsed between the time of the speech and the court's finding that disclosure of the defendants' identity would cause "irreparable harm." *See id.* at *1, *9 (complaint filed November 5, 2010, motion to quash granted November 9, 2011).

1   ¶¶ 12-13. But such websites "are by their nature open to the public and pose no threat to children.

2   That sex offenders – perhaps the most reviled group of people in our community – may 'blog'

3   threatens no child, but the government reporting requirement – that puts a stake through the heart

4   of the First Amendment's protection of anonymity – surely deters faint-hearted offenders from

5   expressing themselves on matters of public concern." *Nebraska,* 2012 WL 4923131 *28; *see also*

6   *White,* 696 F.Supp.2d at 1310 (predatory Internet communications "generally do not occur in

7   communications that are posted publicly on sites dedicated to discussion of public, political, and

8   social issues; identification requirement that applied to speech on such public sites not narrowly

9   tailored).

10          Second, the Act's application to all registrants, but only to registrants, is both over- and

11   under-inclusive. The Act is woefully overinclusive because it applies to *all* registrants, regardless

12   of the age of the conviction, whether they are at high or low risk of re-offending, and whether the

13   registration-triggering conviction had anything to do with the Internet. Most sexual offenders do

14   not re-offend; the longer offenders remain offense-free in the community, the less likely they are to

15   re-offend sexually. Hanson Dec. ¶¶ 2, 7-13, 19. Eventually, they are *less likely* to be arrested for a

16   sex-related offense than individuals who have never been arrested for a sex-related offense. *See id.*

17   ¶¶ 19-37 & Ex. 4; *see also United States v. T.M.,* 330 F.3d 1235, 1240 (9th Cir. 2003) ("The fact

18   that T.M. has lived the last twenty years without committing a sex offense suggests that he no

19   longer needs to be deterred or shielded from the public."). A large proportion of registrants

20   committed their offenses decades ago. *See* Abbott Dec. ¶ 16. And most registrants are classified

21   as low or moderate-low risk upon release. *See id.* ¶ 9. Finally, the vast majority of registrants were

22   convicted of crimes that did not involve the Internet (more than 99%) but did involve victims who

23   already knew the offender (80%-90%). *See* Finkelhor Dec. ¶¶ 12-13; Abbott Dec. ¶ 11. Thus, the

24   Act targets vastly more individuals than it needs to. *See id.* ¶ 22. It "is not narrowly tailored to

25   target those offenders who pose a factually based risk to children through the use or threatened use

26   of the [specified] sites or services." *Nebraska,* 2012 WL 4923131 at *19. The state cannot justify

27   infringing an individual's constitutional rights with "a generalized assessment based on the class of

28   sex offenders generally, rather than on the particular sex offenses a defendant has committed or

13

related offenses he is likely to commit." *United States v. Weber*, 451 F.3d 552, 569 (9th Cir. 2006) (invalidating supervised release condition); *see United States v. Wolf Child*, --F.3d--, 2012 WL 5200347, at \*7 (9th Cir. 2012).

Notably, the CASE Act could achieve its goals if it applied only to those who have been convicted of offenses involving the Internet or who are at high risk of re-offending, or even by allowing persons with very old or minor convictions or those who could otherwise demonstrate that they do not pose a risk to apply to be excluded from the new requirements. *See Berger v. City of Seattle*, 569 F.3d 1029, 1041 (9th Cir. 2009) ("[T]he existence of obvious, less burdensome alternatives is 'a relevant consideration in determining whether the "fit" between ends and means is reasonable.'"). Instead, it prohibits anonymous speech by registrants with no more chance of committing a future sex crime than a typical member of the population. *See* Hanson Dec. ¶¶ 19-34. California cannot possibly argue that it is not feasible to assess the risk of offenders because it currently *mandates* that all § 290 registrants be assessed for risk and uses those assessments to decide which of them need increased supervision. *See* Penal Code §290.04(a)(1), *et seq*. Risk assessment tools, developed based on decades of data and extensive research, are also widely used in the criminal justice field in California and elsewhere. *See* Hanson Dec. ¶ 18. California already recognizes in other contexts that sex offenders are not all alike, and thus publicly discloses varying amounts of information about registrants depending on the offense of conviction, *see* § 290.46(b)-(d),[6] and provides a process for registrants to apply for exclusion from the public registry if they meet certain conditions. *See* § 290.46(e). The existence of "feasible, readily identifiable, and less-restrictive means of addressing" the state's concerns confirm that the statute "is not narrowly tailored." *See Comite*, 657 F.3d at 950.

At the same time, by applying only to registrants, the Act is underinclusive. *See Berger*, 569 F.3d at 1043 (city's rules failed narrow tailoring in light of "significant underinclusiveness"). The overwhelming majority of technology-facilitated sex crimes are not committed by registered sex offenders. Only 4% of persons arrested for technology-facilitated sex crimes against youth

---

[6] Registrants who have been convicted of minor offenses are not included at all on the site, persons convicted of more serious offenses have their names, offenses, and zip codes posted, and those convicted of the most serious offenses have additional information posted, including addresses and photographs. *See id.*

14

were registered sex offenders, and only 2% of those arrested for soliciting undercover investigators were registered sex offenders. *See* Finkelhor Dec. ¶ 18. "[T]he fact that [the statute] is both overinclusive and underinclusive would lead to the conclusion that it is not narrowly tailored to serve the governmental interest at stake." *Ohio Citizen Action v. City of Mentor-On-The-Lake*, 272 F.Supp.2d 671, 684 n.2 (N.D. Ohio 2003).[7]

Third, the Act nowhere restricts public disclosure or potential uses by law enforcement of the identifying information. Instead, release of registry information is governed by the existing law, § 290.45, which grants the government broad discretion to release the information to the public.[8] In fact, a 2009 study found that 39% of California law-enforcement agencies had "proactively" supplied information under this statute to the community by handing out flyers and other similar means, apparently without any reason to think that a crime had occurred, sometimes with serious consequences. *See* Steen Dec. ¶¶ 2-4. "The prospect that Internet Identifiers ... may be released to the community has an obvious chilling effect." *White*, 696 F. Supp. 2d at 1311; *In re Anonymous Online Speakers*, 661 F.3d at 1173. This is starkly illustrated by the experience of Plaintiff Roe, who is engaged in an Internet business and has previously suffered the loss of a prior Internet business after public revelations of his offender status. *See* Roe Dec. ¶ 19; *see also Nebraska*, 2012 WL 4923131 *28 ("the requirement that offenders report to the police regarding the material they post to Internet sites they operate will surely deter offenders in business from maintaining such sites."). Releasing registrants' Internet identifiers to social networking sites in the interest of "public safety" could result in registrants being cut off not only from these services but from the increasingly wide range of activities that require a Facebook or similar account, including participation in online discussions of news articles, political and social issues, and more. *See* Post Dec. n.6. This could even increase recidivism. *See* Abbott Dec. ¶¶ 19-20.

---

[7] The Act is also underinclusive because it applies only to *Internet* speech, and thus excludes all analogous communications that take place over cellular networks or other communications channels with the same characteristics. *See* Post Dec. ¶¶ 39-40. Further, the Act also explicitly excludes "libraries and educational institutions" from its definition of "Internet service providers," despite the fact that such facilities not only provide identical Internet access but may offer greater physical proximity to children. *See* CASE Act, ch. 8, § 13 (codified as amended at § 290.024(a)).
[8] The statute was specifically amended in 2005 to delete the requirement that the police have reasonable suspicion. *See* 2005 Cal. Legis. Serv. Ch. 722 (A.B. 1323).

15

Nor is there limitation on use of the information by law enforcement. *See White*, 696 F.Supp.2d at 1310 (allowing use of Internet identifiers for "law enforcement purposes" was "too broad" and had "obvious" "free speech implication" because agency might "create list of registrant user names for use in monitoring" protected anonymous speech on "targeted Internet sites," creating a chilling effect). The lack of sufficient limits on public disclosure or the governmental use of the information distinguishes the CASE Act from the Utah law that was upheld in *Shurtleff II*, after it was amended to permit use of the information only to investigate a specific sex crime. *See Shurtleff I*, 628 F.3d 1217, 1224; *Shurtleff II*, 2009 WL 2601458 *5.

Further, the vagueness of the Act's definitions of what registrants must provide, as coupled with the serious punishment for failure to provide the correct information, renders it "problematic for purposes of the First Amendment" narrow tailoring test, regardless of whether it is so vague as to violate Due Process. *Reno v. ACLU*, 521 U.S. 844, 870-72 (1997). As a practical matter, vague criminal laws regulating speech are nearly always overinclusive because the "severity of criminal sanctions may well cause speakers to remain silent rather than" risk prosecution for "arguably unlawful" activity. *Id.* at 872. As discussed below, the Act's definitions of "Internet identifier" and "Internet service provider" are incomprehensible. *See infra* Part IV.A.3; *see also* Post Dec. ¶¶ 22-25, 30, 35-37, 40-41, 47, 50-60. A registrant who would like to engage in anonymous Internet speech in a way that only "arguably" falls within the Act's purview would be reckless indeed to risk arrest and imprisonment by doing so. Even construing them as narrowly as possible, the Act's requirements are not narrowly tailored; that they are potentially much broader in scope due its vague definitions only magnifies this constitutional infirmity.

Finally, intermediate scrutiny requires that the government show that "the speech restriction directly and materially advance the asserted governmental interest." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555, 566 (2001).[9] But the facts about recidivism and sex crimes discussed above mean that "it is not particularly useful to require *all* registrants to provide information about their Internet use." Abbott Dec. ¶ 22 (emphasis added). And it is not even clear that the

---

[9] Although this case involved commercial speech, the test it used is "substantially similar" to the intermediate scrutiny that applies to content-neutral regulations of non-commercial speech. *Lorillard Tobacco*, 533 U.S. at 554; *see Comite*, 657 F.3d at 950.

government has developed any way to actually make use of registrants' Internet identifiers or ISPs to prevent or solve sex crimes, much less that it is prepared to process the information received from 73,900 registrants. If the government has no way to use this information to directly advance its goal, it cannot burden speakers by forcing them to provide it.

In short, the statute is facially unconstitutional because it prohibits protected anonymous speech by all registrants but is not tailored to address the state's stated interests in preventing sex offenses and human trafficking. Even if its vague terms are construed as narrowly as possible, it is not limited to the speech or speakers that give rise to the purported dangers the statute seeks to address, and fails to prohibit law enforcement from using the information for purposes unrelated to the prevention or investigation of sex offenses and human trafficking.

### 2. The CASE Act is unconstitutional because its burdensome registration requirements are not narrowly tailored

In addition to criminalizing anonymous speech, the Act also mandates registration for all sorts of online speech, whether anonymous or not. The Act is unconstitutional for the independent reason that these burdensome registration requirements are not narrowly tailored.

### a. The CASE Act's registration requirements trigger First Amendment scrutiny

The First Amendment takes heed not only of flat prohibitions on speech, but also "statutes attempting to restrict or burden the exercise of First Amendment rights." *Broadrick v. Oklahoma*, 413 U.S. 601, 611–12 (1973); *see, e.g., Simon and Schuster, Inc. v New York State Crime Victims Bd.*, 502 U.S. 105, 118 &122 n.* (1991) (invalidating law that "establishe[d] financial disincentive" to certain speech by former offenders); *Laird v. Tatum*, 408 U.S. 1, 11 (1972) ("constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights."); *American Civil Liberties Union v. Reno*, 31 F.Supp.2d 473, 493-95 (E.D. Pa. 1997), *aff'd* 542 U.S. 656 (2004). Because First Amendment rights are fragile, "the amount of burden on speech needed to trigger First Amendment scrutiny as a threshold matter is minimal." *American Legion Post 7 of Durham, N.C. v. City of Durham*, 239 F.3d 601, 607 (4th Cir. 2001); *see Bates v. State Bar of Arizona*, 433 U.S. 350, 380 (1977).

17

The CASE Act's reporting requirements far exceed this minimal threshold for triggering First Amendment scrutiny. The Internet identifier reporting requirement appears to require each registrant to document and report not only her email address and Facebook account but also any "screen name" or similar identifier associated with her comments on news websites and civil rights discussion fora, her participation in professional networks such as LinkedIn and other online sites related to her business or profession, any identifier associated with feedback submitted to an online retailer like Amazon.com or review site like Yelp, and even her own personal blog or web page.[10] *See* Post Dec. ¶¶ 27-37. In addition, the Internet service provider reporting requirements appears to require her to document and report not only her cable Internet, DSL, or cellular Internet provider but also each wireless network she uses at a café or hotel and each device she purchases, rents, or uses that is capable of connecting to the Internet for any reason. *See* Post Dec. ¶¶ 45-47. A registrant facing the possibility of arrest and serious criminal penalties if she fails to document and report each of these online activities—or even if her letter to the police is lost in the mail—may reconsider exercising First Amendment rights at all. *See Nebraska*, 2012 WL 4923131 at *29; Roe Dec. ¶ 21; Doe Dec. ¶ 15. This is more than enough to trigger First Amendment scrutiny.

### b.    The CASE Act must satisfy strict scrutiny because it discriminates among speakers

The First Amendment generally prohibits "restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United v. Federal Election Com'n*, 130 S.Ct. 876, 888 (2010); *see also Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653, 2663 (2011) (applying strict scrutiny to law that "disfavors specific speakers"). Such laws are akin to those that discriminate by content, and are therefore subject to strict scrutiny, under which a law regulating speech is unconstitutional unless the government can "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 130 S.Ct. at 898 (citation omitted). In addition, the law must "choose[] the least restrictive means to further the articulated interest." *Sable Communications v. FCC*, 492 U.S. 115, 126 (1989); *see also, e.g. Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 586, 591 (1983).

---

[10] In a recent case concerning the constitutionality of a similar law, the parties agreed that the term "interactive online forums," similar to the term "Internet forum discussions" in the CASE Act, included blogs. *White*, 696 F.Supp.2d at 1310.

18

1  The CASE Act singles out the speech of § 290 registrants for differential treatment, and must

2  therefore satisfy this heightened standard.[11]

### c. The CASE Act is not sufficiently tailored to satisfy either intermediate or strict scrutiny

Even content-neutral restrictions on speech must meet intermediate scrutiny, meaning that they "must be 'narrowly tailored' to advance the interest asserted by the State." *Simon and Schuster*, 502 U.S. at 122 n.*; *see Comite*, 657 F.3d at 950-51. "To satisfy the narrow tailoring requirement, the Government bears the burden of showing that the remedy it has adopted does not burden substantially more speech than is necessary to further the government's legitimate interests." *Comite*, 657 F.3d at 948.[12]

While the Act must satisfy strict scrutiny, it cannot even satisfy intermediate scrutiny. It fails the narrow tailoring requirement for the reasons discussed above. *See supra* Part IV.A.1.b. The registration requirements, which apply even to participation in a political forum or speech on a professional networking site, are dramatically overinclusive because they cover a great deal of speech that could not possibly be used to facilitate a crime. The Act also places these burdens on all registrants rather than just those individuals (whether registrants or not) who are likely to commit future sex crimes involving the Internet. And the Act fails to limit law enforcement's disclosure and use of the information obtained to furthering the statute's stated goals of preventing and investigating human trafficking and sex offenses. Its vague definitions and requirements, even if not rising to the level of a constitutional defect, increase the overbreadth of its impact. In short, the Act's registration requirements "suppress lawful speech as the means to suppress unlawful speech." *Ashcroft v. Free Speech Coalition*, 535 U.S. at 255. They therefore cannot survive intermediate scrutiny, much less strict scrutiny, under the First Amendment.

---

[11] Strict scrutiny is also required under equal protection. "Since the First Amendment right to free speech is a fundamental right, the court applies strict scrutiny to laws impacting First Amendment rights and discriminating based on any classification." *Denney v. Drug Enforcement Admin.*, 508 F.Supp.2d 815, 835 (E.D. Cal. 2007); *see Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312-13 & n.3 (1976).

[12] Although this narrow-tailoring requirement is most often applied to speech that occurs in a public forum, as *Simon and Schuster* illustrates, it also applies to laws that generally restrict speech, including online speech. *See Golan v. Gonzales*, 501 F.3d 1179, 1196 (10th Cir. 2007); *see also Reno*, 521 U.S. at 868-870.

19

1

### 3.    The CASE Act is unconstitutionally vague

2    The definitions of "Internet service provider" and "Internet identifier" are

3    unconstitutionally vague. "It is a basic principle of due process that an enactment is void for

4    vagueness if its prohibitions are not clearly defined." *Grayned,* 408 U.S. at 108. "An ordinance

5    may be void for vagueness because either it … fails to give a person of ordinary intelligence a

6    reasonable opportunity to know what is prohibited [or] abuts upon sensitive areas of basic First

7    Amendment freedoms, operating to inhibit the exercise of these freedoms." *Hunt v. City of Los

8    Angeles,* 638 F.3d 703, 712 (9th Cir. 2011) (citations omitted). Vague laws violate the principle of

9    fair notice and encourage "arbitrary and discriminatory enforcement." *Grayned,* 408 U.S. at 108.

10    "Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of

11    reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of

12    specificity than in other contexts." *Smith v. Goguen,* 415 U.S. 566, 573 (1974). This is necessary

13    to avoid chilling lawful, constitutionally protected speech. *Grayned,* 408 U.S. at 109. The

14    Supreme Court has invalidated as vague a law that required speakers to identify themselves to the

15    police. *See Hynes v. Mayor and Council,* 425 U.S. 610, 620-623 (1976).

16    The Act defines an "Internet service provider" as "any business, organization, or other

17    entity providing directly to consumers a computer and communications facility through which a

18    person may obtain access to the Internet." CASE Act, ch. 8, § 13 (codified as amended at

19    § 290.024(a)). This definition seems to include not only "traditional" ISPs such as DSL or cable

20    Internet services but also other entities such as cafés, hotels, and even individuals who provide

21    access to an Internet-connected wireless network, and possibly any company that provides an

22    Internet-connected device, ranging from a cellular phone to an automobile or home security system

23    that connects to the Internet for certain functions. *See* Post Dec. ¶¶ 46-48. The definition also

24    could encompass the use of products or services other than Internet access provided by a company

25    that acts as an "Internet service provider" to other persons. *See id.* ¶ 50. In addition, it is unclear

26    whether the definition encompasses only ongoing contractual relationships or whether it also

27    covers one-time use of a wireless network, whether or not the registrant is even aware of such

28

1    use.[13] *See id.* ¶¶ 47-49, 51-55.

2    In addition, it is unclear exactly what must be reported pertaining to the use of an ISP. One

3    set of provisions of the Act require a registrant to provide "[a] *list* of any and all Internet service

4    providers used by the person" as well as "[a] statement in writing signed by the person

5    acknowledging that the person is required to register and update [such list] as required by this

6    chapter," CASE Act, ch. 8, § 12 (codified as amended at § 290.015(a)(5)-(6)) (emphasis added),

7    while a separate provision of the Act requires a registrant to notify the agencies with which she is

8    registered whenever she "adds or changes [his] *account* with an Internet service provider." CASE

9    Act, ch. 8, § 11 (codified as amended at § 290.014(b)) (emphasis added). These two provisions

10    create confusion as to whether, for example, a registrant must report the use of a wireless network

11    if no account is required for its use, or if a roommate or employer rather than the registrant herself

is the account holder.

12    Finally, the Act fails to specify whether a registrant is required to report only information

13    about ISPs that she currently uses or whether she is instead required to provide information about

14    every Internet service provider she has ever used. The latter requirement would place a huge

15    burden on registrants, who would be forced to document their entire history of network and

16    Internet access or suffer criminal sanctions.

17    The definition of "Internet identifiers" renders compliance equally difficult. In the case of

18    Internet identifiers, registrants must inform the appropriate agency or agencies of "any electronic

19    mail address, user name, screen name, or *similar identifier* used for the purpose of Internet forum

20    discussions, Internet chat room discussions, instant messaging, social networking, or *similar*

21    *Internet communications*." CASE Act, ch. 8, § 13 (codified as amended at § 290.024 (b))

22    (emphasis added). However, the Act provides no further definition of the specific terms used in

23    this definition, and there is no consensus as to the meaning of these terms.

24    For example, in examining a law prohibiting the use of "instant messaging" services by sex

25    offenders registered under Nebraska's statute, one judge noted the difficulty in determining

26

27    [13] For example, a laptop computer or mobile device can be configured to automatically connect to
      any "open" wireless network that it detects, requiring no action on the part of the user but arguably

28    triggering the reporting requirements of the Act. *See* Post Dec. ¶¶ 46, 48(c).

21

whether "text messages" and "instant messages" were differentiable and, if so, whether a registrant would be permitted to use a service that offered both "text messaging" and "instant messaging" services if the registrant utilized only the "text messaging" functionality. *Nebraska*, 2012 WL 4923131 at *21; *see also* Post Dec. ¶ 40. Furthermore, in Internet jargon "chat" typically means near-real-time communications with one or more persons, and as such is essentially indistinguishable from "instant messaging." *See* Post Dec. ¶¶ 31-32.

Similarly, there is no consensus definition of "social networking," and competing definitions are in tension.[14] *See id.* ¶ 35 & n.5. An increasing number of sites incorporate some functions that are traditionally associated with social networks, such as the creation of a profile and the use of mechanisms for communicating and linking with other users. *See id.* ¶ 36. The total number of sites incorporating social networking functionality, and thus potentially qualifying as "social networking" sites under the Act, is estimated to be in the millions if not hundreds of millions. *Id.* ¶¶ 36-37.

The inclusion of "similar" identifiers and services in the definition of "Internet identifiers" creates further uncertainty. It is all but impossible for a registrant to know whether the use of an email mailing list is "similar" to participating in an Internet forum discussion or a social network; whether Wikipedia, which permits users to establish a profile and communicate directly and indirectly with each other, is "similar" to a social network or Internet forum discussion; whether making a VoIP call or sending audio or text communications to other players in an online game is "similar" to an "Internet chat room discussion," or whether writing a blog post or reviewing a recently-purchased item is "similar" to some covered form of Internet communication such that any associated identifier must be reported.

In addition, the Act is unclear as to what a registrant is actually required to report. While the language of the Act only requires registrants to report the "Internet identifier" (*e.g.*, "JohnDoe") and not the site on which that identifier was used, obtaining an identifier without the associated site is frequently of no practical value. *See id.* ¶¶ 22-24. As a result, law enforcement agencies may

---

[14] For example, a simple blog could qualify as a "social networking website" under a definition used in federal law but would not meet the definition provided by a frequently-cited academic article, whereas a professional network such as LinkedIn would qualify as a "social network site" under the article's definition but not under the federal definition. *See* Post Dec. ¶ 35 & n.5.

22

demand that registrants provide the Internet identifier associated with a specific site or the site associated with each Internet identifier. *See id.* ¶ 24. Similarly, under one plausible reading of the Act, a registrant would be required to report only once that he has created the new screen name "JohnDoe" and may then use that identifier on as many sites as he chooses; under another, he must report each use of *his own full name* as a user name or screen name. *See* Post Dec. ¶ 25.

The Act requires reporting of certain identifiers "used for the purpose of" certain forms of communication. Again, the precise meaning is unclear: is an identifier "used for the purpose of" a certain form of communication if its creation *permits* that form of communication, or only if the creator actually *engages* in that form of communication? For example, an account on Amazon.com allows a user both to purchase items and to post feedback on purchased items. Assuming that posting feedback constitutes participating in an "Internet forum discussion," it is unclear whether a registrant is required to report the creation of an account on Amazon.com even if she never intends to post feedback.

Regulations that impact "sensitive areas of basic First Amendment freedoms" must be particularly clear to avoid chilling legitimate speech. *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *see Hunt*, 638 F.3d at 712-13. The CASE Act is rife with imprecise definitions and uncertain requirements. Registrants have already expressed confusion over what they must report. *See* Bellucci Dec. ¶ 13 & Ex. B. The Act is unconstitutionally vague because it fails to provide guidance to a person of ordinary intelligence as to what information she is required to report about her online speech, and the penalty for getting it wrong is prison.

### 4. The CASE Act violates Plaintiffs' freedom of association by requiring the compelled disclosure of the membership of their online communities

Requiring registrants to disclose the online communities or groups of which they are a member implicates their "right to be protected from compelled disclosure by the State" of their associations and affiliations, and thus the freedom of association. *NAACP v. Alabama*, 357 U.S. 449, 458 (1958). The CASE Act would require the disclosure of all such groups, including groups advocating dissident beliefs where "privacy in group association may ... be indispensable to preservation of freedom of association." *Id.* at 462 (citation omitted); *see also Brown v. Socialist Workers*, 459 U.S. 87, 91 (1982); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1159-60 (9th Cir.

23

2010). Even a legitimate purpose "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker*, 364 U.S. 479, 488 (1960); *see NAACP*, 357 U.S. at 463, 464-65.

The CASE Act could effectively require every registered sex offender to disclose her relationship with online organizations regardless of type, purpose, or membership, including her membership with the NAACP or California Reform if she interacts with those organizations online. *See* Bellucci Dec. ¶¶ 17-18; Post Dec. ¶¶ 23, 78-79. Because "[m]any such relationships could have no possible bearing" on the state's interest in deterring and investigating Internet sex crimes and the Act's "comprehensive interference with associational freedom goes far beyond what might be justified in the exercise of the State's legitimate" interest, this requirement violates the First Amendment. *Shelton*, 364 U.S. at 487-88, 490.

**B.    Plaintiffs Face Imminent and Irreparable Harm**

As a matter of law, "the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)* (9th Cir. 2012) (citation omitted); *see Farris*, 677 F.3d at 868; *Sammortano v. First Jud. Dist. Court*, 303 F.3d 959, 973 (9th Cir. 2002). As discussed above, the law prohibits online anonymous speech and chills much more speech than that. *See* Roe Dec. ¶ 20; Doe Dec. ¶ 14; Bellucci Dec. ¶¶ 12, 17-18. The revelation of their identities can never be undone. *See Art of Living*, 2011 WL 5444622 at *9. Moreover, registrants face the ongoing burden of recording and reporting each Internet service provider and each Internet identifier that they use, which will deter them from participating in online communications in the first instance. *See* Doe Dec. ¶ 15; Roe Dec. ¶ 21.

**C.    An Injunction Against Enforcement Serves the Public Interest and the Balance of Equities Tips in Plaintiffs' Favor**

When a preliminary injunction is sought against the government, these last two prongs "are largely the same" and can be considered together. *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010); *see Farris*, 677 F.3d at 864 (considering both prongs together); *Klein*, 584 F.3d at 1208 (same). As the Ninth Circuit has recently confirmed, "it is *always* in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (citation omitted, emphasis added); *see Klein*, 584 F.3d at 1208.

An injunction here will maintain the status quo while the court considers a law that was passed by the voters only yesterday and purports to require more than 73,000 individuals to "immediately" report to the police and provide what for many may be a large amount of information about their Internet use or face criminal prosecution. It is not even clear that the government will be able to do anything with this enormous influx of information in the near future, or even that the states' registrants even know of this new requirement, with its serious criminal penalties for failure to comply immediately.

### D.    Scope of Relief

Defendant Harris is the chief law-enforcement of the state, with supervisory authority over local prosecutors and law enforcement. *See* Ca. Const. art. V § 13; Ca. Gov't Code §§ 12511, 12512, 12524, 12550, 12560. Her Department is responsible for implementing many of California's registration requirements. *See* §§ 290.012(d), § 290.014(b) 290.022, 290.09(b)(2). Thus, all such persons are acting as her agents and will be bound by an injunction against her under Rule 65(d)(2). *See ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999).

## V.    CONCLUSION

For the foregoing reasons, the Court should immediately issue interim injunctive relief prohibiting enforcement or implementation of the provisions of the CASE Act here at issue, Penal Code §§ 290.014(b) and 290.015(4)-(6), as enacted by Proposition 35, or from otherwise requiring registrants to provide identifying information about their online speech to the government.

DATED: November 7, 2012                    Respectfully submitted,

By: _____

Michael T. Risher
Linda Lye
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hanni Fakhoury
Lee Tien
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

Attorneys for Plaintiffs
JOHN DOE, *et al.*, on behalf of themselves
and others similarly situated

MPA ISO TEMPORARY RESTRAINING ORDER &
PRELIMINARY INJUNCTION